**BOIES SCHILLER FLEXNER LLP**
Brooke Alexander (Pro Hac Vice Pending)
balexander@bsfllp.com
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao (SBN 236165)
mmao@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6858
Facsimile: (415) 999-9695

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWIN GARRISON, GREGG PODALSKY, SKYLER LINDEEN, ALEXANDER CHERNYAVSKY, GARY PIANO, SUNIL KAVURI, GARY GALLANT, & DAVID NICOL on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SHOHEI OHTANI, NAOMI OSAKA, LAWRENCE GENE DAVID & SOLOMID CORPORATION, D/B/A TEAM SOLOMID, TSM AND/OR TSM FTX <br><br> Defendants. | Case No.: 2:23-cv-05951 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiffs, on behalf of themselves and all others similarly situated, sue Defendants, who all promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading"), West Realm Shires Services Inc. d/b/a FTX US's ("FTX US"), and Alameda Research, LLC's (collectively, the "FTX Group" or "FTX"), offer and sale of unregistered securities, including but not limited to the Deceptive FTX Platform, identical FTX yield-bearing accounts ("YBAs") and FTX's native cryptocurrency token, "FTT," and also aided, abetted and/or actively participated in the FTX Group's massive, multibillion dollar global fraud.

## INTRODUCTION

1. This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation,* MDL No. 3076, ECF No. 138 (J.P.M.L. June 5, 2023), is attached as **Exhibit A**. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance WITH Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *Garrison, et al. v. Sam Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM (S.D. Fla.) is being filed again before this Court in this District in order to address the arguments Defendants Ohtani, Osaka, David, and Solomid Corporation raise regarding whether the Transferee Court has jurisdiction over them for these claims. The substantive allegations in both actions are the same, and will be amended in a consolidated amended class action complaint currently due to

be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.      Everyone now agrees the FTX Disaster is the largest financial fraud in US history. Sam Bankman-Fried, FTX's founder and former CEO, is on house arrest awaiting his criminal trial in October of this year. FTX's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe. These Defendants conspired and aided and abetted FTX's multi-billion-dollar fraud and conversion for their own financial and professional gain.



CLASS ACTION COMPLAINT

3.      What's more, FTX would not have been successful in perpetrating this fraudulent scheme on Plaintiffs and Class Members around the globe without key events that took place in and emanated from  Miami, Florida, which not only eventually became FTX's official headquarters but was their de facto domestic headquarters for years before FTX's eventual collapse. According to the Declaration of Dan Friedberg, attached as **Exhibit B**, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually moved its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, who was based in Miami and originally worked for Blockfolio as Director of Product and Partnership before FTX later acquired Blockfolio in late 2020.[1] *Id.* Dabir eventually became FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

4.      Mr. Dabir operated from FTX's Miami office, and he was focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA. *Id.*

5.      According to Friedberg, Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

---

[1]    *See*  https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/ (accessed May 10, 2023); *see also* https://www.crunchbase.com/organization/blockfolio/people (accessed May 10, 2023).

6.     The naming of the "FTX Arena" served as an important centerpiece for FTX's efforts to reach other FTX partnerships with celebrities and other well-known partners. *Id.*, ¶ 23. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*

7.     Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, according to Friedberg, it was the first time that he had ever agreed to serve as a spokesperson for any product. *Id.*, ¶ 24. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*

8.     Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast *The Joe Pomp Show*, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit C**.

9.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. C at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.*

10.     After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he

identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3. Dabir explained that a contributing factor to the deal was "the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue," which "opened up the door where we could have that conversation" with Miami-Dade County and the Miami Heat. *Id.*, at 4.

11. Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

12. In order to close the FTX Arena deal, according to Mr. Dabir, FTX confidentially disclosed to Miami-Dade County and the Miami Heat FTX's balance sheet—which was comprised almost entirely of customer funds—and he explained to Mr. Pompliano that "there are ways to structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort." *Id*.

13. Mr. Dabir explained that there were multiple ways that FTX measured the success of their Brand Ambassador program, with the "obvious one [being] straight up conversion," as in "[h]ow many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easy to track." *Id.*, at 6. But the other method, according to Mr. Dabir, is the "intangible element" of "trust" and "legitimacy" that comes from "building trust and value through brand association," like "I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David." *Id.*

14. Mr. Dabir also explains how he oversaw and participated in the creation of Larry David's now infamous 2022 Super Bowl ad, and recounting,

"when we saw the script, we were like, this script is awesome. And then-then we're like, 'We have to get Larry David, right?' And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?" *Id.*, 7.

15. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

16. FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This Federal Consolidated Action may be the only avenue for any of the victims to recover any of their damages. This action is specifically brought against persons and celebrities who were specifically warned by the SEC back in 2017 (and in many FTC Guidelines), that if they promote cryptocurrency products like the Deceptive FTX Platform, YBAs, or FTT, and those products are found to be "securities," those people may be liable under state and/or federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

17. The question of whether the promotion of the Deceptive FTX Platform, the sale of every YBA and/or FTT is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[2]

---

[2] https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed May 11, 2023).

In the SEC's Report of Investigation concerning The DAO,[3] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

18.     The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this exact same type of interest-bearing account and native token, finding that exchanges such as BlockFi,[4] Voyager,[5] and Celsius[6] all offered these same products as unregistered securities.

19.     A second narrow issue that is common to the entire Proposed Class, whose focus is also solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long-established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

20.     We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating

---

[3] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[4] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

[5]     https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/     (accessed May 11, 2023).

[6] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed May 11, 2023).

on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in the Deceptive FTX Platform, FTT, and/or a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held on the Deceptive FTX Platform or in the YBA. In other words, the Deceptive FTX Platform and YBAs were portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the Deceptive FTX Platform and the offer and sale of YBAs and/or FTT, all of which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Group.

21.    Literally overnight, Plaintiffs' assets, including FTT,[7] held on the Deceptive FTX Platform and/or in their YBAs were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Group:

---

[7] Although the FTX Group purported to maintain a separation between the US and International platform—in large part because it knew its products offered on the international exchange were securities required to be registered with securities regulators—the separation was merely a farce and was easily circumvented (which was something that the FTX Group encouraged) through the use of, for instance, a VPN. See https://blockduo.com/ftx-usa/ ("FTX, like other crypto exchanges, uses something called geo-blocking to stop users from restricted countries from using the exchange. They do this by seeing where your IP address is, and if it is from one of the banned countries, they will block you from the site. With the now wide availability of VPNs, this can be bypassed") (accessed May 11, 2023). The use of VPNs to circumvent geo-blocking for cryptocurrency exchanges is a well-known and widely used method encouraged by the exchanges to rake in as many new U.S.-based customers as possible to keep new funds loading onto their platform. See CFTC v. Changpeng Zhao, et al., No. 1:23-cv-01887, ECF No. 1 (N.D. Ill. Mar. 27, 2023) (CFTC enforcement action brought because "Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ('VPNs') to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.").

I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

*Never* in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is *unprecedented***.

See In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

22.   The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is

established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

23.     The Deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## FACTUAL BACKGROUND

24.     Undersigned Counsel have been investigating and litigating these specific issues for over a year before this Court. On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager

Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiffs and Voyager class members all sustained losses in excess of $5 billion.

25.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

26.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered

securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)  on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[8]

27.  On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

28.  On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

29.  Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Group were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

---

[8] https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed May 11, 2023).

30.     Instead, as explained below, the FTX Group imploded, their over $30 billion in value evaporated almost overnight, and the FTX Group found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the Deceptive FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

31.     Part of the scheme employed by the FTX Group involved utilizing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the Deceptive FTX Platform, the YBAs, and/or FTT, which were offered and sold largely from the FTX Group's domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

32.     Importantly, although Defendants disclosed their partnerships with the FTX Group, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[9]

33.     Moreover, as explained in detail below, there were clear red flags that sophisticated investors like the FTX Brand Ambassador Defendants would be able to identify while doing any modicum of due diligence to either ask follow up questions or decline the opportunity to conduct further business together.

---

[9] https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed May 11, 2023).

CLASS ACTION COMPLAINT

34.     The fact that the FTX Brand Ambassadors jumped at the opportunity to work with the FTX Group—and be paid millions, tens of millions, or even hundreds of millions in cash, equity stakes, and/or cryptocurrency to do so—is strong circumstantial evidence that these FTX Brand Ambassador Defendants had actual knowledge that the FTX Group was a fraudulent Ponzi scheme that was converting its customers' funds for its own use. Yet, they still participated in the FTX Group's scheme, and proximately caused the damages to the Plaintiffs and the Class.

35.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc., for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

36.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements.[12]

37.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for

---

[10] https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed May 11, 2023).

[11]        https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed May 11, 2023).

[12] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed May 11, 2023).

soliciting and/or personally participating in their purchases of the unregistered Deceptive FTX Platform, YBAs, and/or FTT. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

38.    This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiffs and the Class and to force Defendants to make them whole.

## PARTIES

39.    Each Plaintiff is among the class of individuals the FTX Brand Ambassador Defendants, through their paid promotions on behalf of FTX, influenced or attempted to influence to invest in FTX crypto-related securities, and each Plaintiff made such investments after being exposed to some or all of the FTX Brand Ambassador Defendants' promotional activities described in this Complaint. In addition, each Plaintiff was harmed by the conduct of the FTX Insider, including their promotion and maintenance of the Deceptive FTX Platform, their participation in FTX's offering or sale of unregistered securities, and their misrepresentations and omissions regarding the FTX Platform.

40.    **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and

omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendants are liable.

41.     **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendants are liable.

42.     **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

43.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform

and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

44.     **Plaintiff Gary Piano** is a citizen and resident of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Piano purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Piano has sustained damages for which Defendants are liable.

45.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendants are liable.

46.     **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

47.     **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

48.     **FTX Brand Ambassador Defendants** are all persons and/or companies, that: (1) agreed to serve as "Brand Ambassadors" for FTX, (2) all admittedly advertised and promoted the sale of the Deceptive FTX Platform, YBAs and/or FTT and (3) none of them disclosed, in any of their marketing campaigns and/or advertisements, that they were paid millions of dollars by FTX and profited from the sale of cryptocurrency, Deceptive FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

49.     **Defendant Shohei Ohtani,** a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

50.     **Defendant Naomi Osaka**, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

51.     **Defendant Lawrence Gene David,** an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

52.     **Defendant Solomid Corporation, d/b/a Team Solomid, TSM, and/or TSM FTX ("TSM"),** a professional esports organization that inked a $210 million naming rights deal with FTX Group on June 4, 2021, is a corporation operating and existing under the laws of the State of California.

### JURISDICTION AND VENUE

53.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

54.     This Court has general personal jurisdiction over Defendants Ohtani, Osaka, and David because Defendants Ohtani, Osaka, and David are domiciled in this state, and Defendants Ohtani, Osaka, and David are engaged in substantial and not isolated activity within this state, rendering Defendants Ohtani, Osaka, and David subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendants Ohtani, Osaka, and David because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction….and [t]ransfers under Section

1407 are simply not encumbered by considerations of in personam jurisdiction….”
*In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendants because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendants regularly conducted business in Florida and/or engaged in continuous and systematic activities within Florida, and committed tortious acts in the state of Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

55. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants Ohtani, Osaka, and David reside in this District. Venue is also proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1407, because the Panel ordered in its Transfer Order that all Related Actions be transferred to the Transferee Court and consolidated into the FTX MDL for pretrial purposes. Venue is further proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1391 because acts, practices, and courses of business constituting the violations alleged I within this Complaint occurred within this District.

56. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.   Background on FTX and its Key Players.

57. Until seeking the protection of the Bankruptcy Court, the FTX Group operated a multi-billion-dollar mobile application cryptocurrency investment service (the “Deceptive FTX Platform”) that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

58.     Attached as **Exhibit D** is the Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade Blockchain Investigation Agency, which is incorporated into this complaint in its entirety by reference, and additionally as cited.

59.     As Sibenik explains, in many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. Ex. D ¶ 10.

60.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Ex. D ¶ 11. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets. *Id.*

61.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. Ex. D ¶ 12. This credit can be regarded as a liability of the exchange to its customer. *Id.*

62.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

a)  Trade it for another cryptocurrency

b)  Trade it for fiat currency

c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances. Ex. D ¶ 13.

63.     The exchange accounts should very much be regarded as being custodial in nature. Ex. D ¶ 14. This means that the customer does not *control* access to the assets 'in' their account. *Id.* The customer needs to make a request to the exchange to be able to access and send those balances. *Id.* The exchange then debits the user account and sends the assets. *Id.* Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange. *Id.*

64.     One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so. Ex. D ¶ 15.

65.     For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. Ex. D ¶ 16. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or*
> *may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital*

*Assets by sending them to a different blockchain address controlled by you or a third party."*[13]

*Id.*

66.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. Ex D ¶ 17. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. *Id.* However, it should also be noted that the digital assets aren't technically 'in' the account at all. *Id.* At a technical level, an exchange account cannot hold or store cryptocurrency. *Id.* The account stores a record of a liability or an IOU to the exchange's customer. *Id.* When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. *Id.* Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true. *Id.*

67.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds. Ex. D ¶ 18.

---

[13]     https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

68.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report. Ex. D ¶ 19.

69.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account. Ex. D ¶ 20.

70.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Ex. D ¶ 21. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

71.     Exchanges, on the other hand, are not subject to capital control requirements. Ex. D ¶ 22. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public. *Id.*

72.     Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Ex. D ¶ 23. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. *Id.* While some exchanges will sometimes claim they have 'insurance,'

the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted. *Id.*

73.    Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets. Ex. D ¶ 24.

74.    The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. Ex. D ¶ 25. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. *Id.* 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money. *Id.*

75.    This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[14] often in spectacular fashion. Ex. D ¶ 26. The most common reasons for an exchange's failure include:

> a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

---

[14] https://www.cryptowisser.com/exchange-graveyard/ (accessed May 11, 2023).

b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

c) A hack or theft by an external actor

d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

76.     When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back. Ex. D ¶ 27.

77.     Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. Ex. D ¶ 28. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. *Id.* Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. *Id.* However, what an exchange says, and what they actually do are two different things entirely. *Id.* It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they say it. *Id.*

78.     This is not to suggest that exchanges cannot be a much safer place to store assets. Ex. D ¶ 29. They can be with appropriate regulation and oversight. In

fact, it appears that for FTX Japan[15] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan. *Id.*

### Sam Bankman-Fried

79.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

80.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[16] after stints in the charity world and at trading firm Jane Street.[17] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

81.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *USA v. SBF*, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including

---

[15]     https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

[16]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[17]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money. Defendants, while complicit in Bankman-Fried's misconduct, have thus far escaped criminal liability.

### Caroline Ellison

82. By 2018, Bankman-Fried had persuaded Ellison to join him at Alameda Research. Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

83. In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

84. After Bankman-Fried established FTX in 2019, Ellison began taking more responsibility at Alameda Research.

85. In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following

Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[18]

86.    Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

87.    "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[19]

88.    In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. In entering her guilty plea, she told a federal judge in Manhattan:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular

---

[18] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

[19] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

CLASS ACTION COMPLAINT

currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.

While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to

cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[20]

89.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[21]

**Gary Wang**

90.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

91.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[22]

92.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[23] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

93.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take

---

[20] https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[21] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[22] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[23] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

94.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[24]

95.     Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[25]

96.     At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[26]

97.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. In entering his guilty plea, he told a federal judge in Manhattan:

> Between 2019 and 2022, as part of my employment at FTX, I was
> directed to and agreed to make certain changes to the platform's code.
> I executed those changes, which I knew would Alameda Research
> special privileges on the FTX platform. I did so knowing that others

---

[24]   https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

[25]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[26]
https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

### Nishad Singh

98.     Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

99.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

100.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[27]

101.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[28]

102.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

---

[27] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[28] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

103.   Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

104.   After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

105.   "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[29] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

106.   Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[30] A similar relationship may be in place at FTX's core properties.[31]

107.   On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried, apologized for his role in FTX's scheme, and admitted that he knew by mid-

---

[29] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

[30] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[31] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

1    2022 that Alameda was borrowing FTX customer funds and that customers were

2    not aware.[32]

3

4

5    **B.    The Rise and Fall of FTX.**

6         108.    The FTX.com exchange was extremely successful since its launch.

7    This year around $15 billion of assets are traded daily on the platform, which now

8    represents approximately 10% of global volume for crypto trading. The FTX team

9    has grown to over 300 globally. Although the FTX Group's primary international

10   headquarters is in the Bahamas, its domestic US base of operations is located in

11   Miami, Florida.[33]

12        109.    FTX quickly became one of the most utilized avenues for nascent

13   investors to purchase cryptocurrency. By the time FTX filed for bankruptcy

14   protection, customers had entrusted billions of dollars to it, with estimates ranging

15   from $10-to-$50 ***billion dollars***.

16        110.    Bankman-Fried got rich off FTX and Alameda, with the two

17   companies netting $350 million and $1 billion in profit, respectively, in 2020 alone,

18   according to Bloomberg.

19        111.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had

20   become a major political donor, gotten celebrities like the Defendants in this action

21   to vociferously promote FTX, and secured the naming rights to the arena where the

22   NBA's Miami Heat play.[34]

23

24

25   [32]    https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/
     (accessed May 11, 2023).

26   [33]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-
     chicago-to-miami/ (accessed May 11, 2023).

27   [34]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-
     endstory-related-recommendations= (accessed May 11, 2023).

28

112.   In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[35]

113.   Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[36]

114.   After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[37] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[38]

115.   The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled

---

[35]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[36]   https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

[37]   https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[38]   https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

customer funds and the possibility of a federal investigation.[39] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[40] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

116. Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[41]





[39] https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[40] https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[41] https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







CLASS ACTION COMPLAINT







117.    On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[42]

118.    According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX Group lent more than *half* of its *$16*

---

[42]  https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

***billion*** in ***customer funds*** to Alameda in total, with more than ***$10 billion in loans outstanding***.[43]

119.    While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

120.    First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

121.    Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their cryptoassets out of the exchange at the same time.

122.    Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. The difference is that FTX, unlike venture capital funds generally, was misrepresenting what it was doing with customers' assets.

---

[43] https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed May 11, 2023).

123.   Given these facts, it appears that any person who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

124.   Thus, as will be illustrated below, the FTX Brand Ambassador Defendants' promotion of "FTX"—be it the Deceptive FTX Platform, YBAs, and/or FTT—was necessarily the promotion of unregistered securities.

125.   At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[44]

126.   Later, the Wall Street Journal reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[45] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[46]

127.   CNBC also reported on the relationship among FTX and Alameda, citing "a source familiar with company operations," that Alameda "was able to quietly use customer funds from . . . FTX in a way that flew under the radar of investors, employees and auditors in the process." It did so "using billions from

---

[44] https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[45]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

[46]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

FTX users without their knowledge." CNBC's report explains that FTX, as a crypto exchange, needed to hold enough cash to match customer deposits in the event customers wanted to cash out. "They needed the same cushion, if not more, in the event that a user borrows money to make a trade. According to the source, FTX did not have nearly enough on hand."[47]

128.    The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

129.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> From at least May 2019 through November 2022, Bankman-Fried engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto asset trading platform of which he was CEO and co-founder, at the same time that he was also defrauding the platform's customers. Bankman-Fried raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures. Unbeknownst to those investors (and to FTX's trading customers), Bankman-Fried was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire. *Id.* ¶ 1.

> [F]rom the start, Bankman-Fried improperly diverted customer assets to his privately-held crypto hedge fund, Alameda Research LLC ("Alameda"), and then used those customer funds to make

---

[47] https://www.cnbc.com/2022/11/13/sam-SBFs-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (last accessed May 4, 2023).

undisclosed venture investments, lavish real estate purchases, and large political donations. *Id.* ¶ 2.

When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

130.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

C.    **The FTX Group, Which Was Effectively One Entity Controlled By Bankman-Fried, Was Rife with Red Flags.**

131.    On April 9, 2023, Current FTX CEO John J. Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as **Exhibit E** (the "First Interim Rpt.").

132.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical

48

areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 6–7.

133.   After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual

collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

134.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

135.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

136.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

    **a.**  Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

**b.** Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

**c.** Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

**d.** Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

**e.** "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

**f.** the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

**g.** "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack,

1    Signal, and Telegram with "disappearing messages" enabled, and

2    often approving expenses and invoices on Slack by "emoji," *Id.*;

3    **h.** "The FTX Group did not observe any discernable corporate

4    formalities when it came to intercompany transactions. Assets and

5    liabilities were routinely shuffled among the FTX Group entities and

6    insiders without proper process or documentation. Alameda routinely

7    provided funding for corporate expenditures (*e.g.*, paying salaries and

8    other business expenses) whether for Alameda, for various other

9    Debtors, or for FTX DM, and for venture investments or acquisitions

10   whether for Alameda or for various other Debtors. Alameda also

11   transferred funds to insiders to fund personal investments, political

12   contributions, and other expenditures—some of which were

13   nominally 'papered' as personal loans with below-market interest

14   rates and a balloon payment due years in the future." *Id.,* 17;

15   **i.** Often times, intercompany and insider transfers were recorded in a

16   manner "that was inconsistent with the apparent purpose of the

17   transfers," for instance, tens of millions of dollars being transferred

18   from Alameda to Bankman-Fried, personally, but recorded in the

19   general ledger as "Investment in Subsidiaries: Investments-

20   Cryptocurrency," often times recorded in a way that intercompany

21   transactions did not balance across relevant entities, nor were they

22   recorded with specificity regarding which digital assets were involved

23   in the transfer and their value when transferred, *Id.*;

24   **j.** On both FTX International and US exchanges, Alameda was a

25   customer that traded "for its own account as well as engaging in

26   market-making activities, and, in that capacity, it was granted

27   extraordinary privileges by the FTX Group," such as granting

28

Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the Deceptive FTX Platform, *Id.,* 18–22; and finally

k. There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

137.    Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

138.   To be sure, there are certainly enough red flags detailed over the previous 5 pages that any sophisticated investor vetting the FTX Group for a significant investment and/or partnership opportunity, like the FTX Brand Ambassador Defendants (as opposed to a general FTX Group customer, who would not be granted access to or entitled to ask for these internal materials when accessing the FTX Platform via computer or phone app), who is doing any modicum of due diligence would be able to identify enough warning signs to either ask additional questions or decline the opportunity to conduct further business together.

139.   Indeed, how the sophisticated FTX Brand Ambassadors, like Ohtani, Osaka, and David when they all put their images, likenesses, personae, and credibility on the line to induce Plaintiffs and the Class to invest in the Deceptive FTX Platform, YBAs, and/or FTT, is beyond the pale.

140.   The fact that these FTX Brand Ambassadors jumped at the opportunity to work with the FTX—and be paid millions, tens of millions, or even hundreds of millions in cash, equity stakes, and/or cryptocurrency to do so—is strong circumstantial evidence that these FTX Brand Ambassador Defendants had actual knowledge that the FTX Group was a fraudulent Ponzi scheme that was converting its customers' funds for its own use. Yet, they still participated in the FTX Group's scheme, and proximately caused the damages to the Plaintiffs and the Class.

**D.    The SEC's Consistent Approach to Cryptocurrency.**

**a.  Overview**

141.   Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead

intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

142.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> "The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[48]

143.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former

---

[48] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

144.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[49] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[50] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

145.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[51]

146.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[52] In 2017, the Commission took the

---

[49] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[50] Id.

[51] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[52] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[53] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[54]

147.   In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[55]

148.   In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[56] multiple speeches,[57] Congressional testimony,[58] and several official SEC statements[59] and proclamations.[60] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms

---

[53] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[54] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[55] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[56] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[57] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[58] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[59] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[60]   https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

and decentralized finance,[61] warning that their failure to register with the SEC may violate U.S. securities laws.[62] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[63]

149.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[64] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[65] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[66]

150.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[67]

151.    What follows are summaries of five cases that will help inform this litigation.

---

[61] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[62]         https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html (accessed May 11, 2023).

[63] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[64] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[65] Id.

[66] Id.

[67] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

### b. SEC v. KIK

152.    In Kik[68], the SEC's complaint[69], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[70]

153.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

### c. SEC v. Telegram

154.    In Telegram,[71] the SEC filed a complaint[72] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

---

[68] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[69] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[70]    https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

[71] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[72] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

155.    Telegram argued[73] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

156.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[74] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

157.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### d.  SEC v. BlockFi

158.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [75]with failing to register the offers and sales of its retail crypto-lending product and also charged

---

[73]   https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[74]   SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

[75]   https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

1  BlockFi with violating the registration provisions of the Investment Company Act
2  of 1940.

3        159.    BlockFi argued for "increased regulatory clarity" but lost.[76]

4        160.    To settle the SEC's charges, BlockFi agreed to pay a $50 million
5  penalty, cease its unregistered offers and sales of the lending product, BlockFi
6  Interest Accounts (BIAs), and bring its business within the provisions of the
7  Investment Company Act within 60 days. BlockFi's parent company also
8  announced that it intends to register under the Securities Act of 1933 the offer and
9  sale of a new lending product. In parallel actions, BlockFi agreed to pay an
10 additional $50 million in fines to 32 states to settle similar charges.

11                    **e.  SEC Wells Notice to Coinbase**

12       161.    In 2021, Coinbase began marketing a cryptocurrency lending product
13 called Lend. The Lend program purported to allow some Coinbase customers
14 to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin
15 (USDC)."[77] According to Coinbase, its lawyers reached out to the SEC to discuss
16 its Lend product, at which point SEC staff instead served Coinbase with a *Wells
17 Notice,* informing Coinbase of their intention to seek approval from the SEC
18 Commissioners to file a civil enforcement action against Coinbase for violating the
19 federal securities laws.

20       162.    According to Coinbase, the SEC issued the Wells Notice because of
21 Coinbase's failure to file a registration statement with the SEC for the offering of
22 its Lend product, which the SEC believed was a security.[78]

23       163.    The two cases that Coinbase claims the SEC cites as support for its
24 *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young. Reves* addressed the

---

[76] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

[77] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

[78] *Id.*

question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

164.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

165.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

166.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

167.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);
- The plan of distribution of the note (e.g. is the product being marketed as an investment?);
- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and
- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

168.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors (especially disgruntled ones) would certainly expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

169.    Given the clear facts of this case, Coinbase decided to cancel the Lend program.[79]

E.    **FTX's offer and sale of YBAs, which are unregistered securities.**

170.    Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

171.    The details of the Earn program are still listed on the FTX website,[80] and additional information on Earn is described in a declaration submitted in the

---

[79] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed May 11, 2023).

[80] FTX App Earn – FTX Exchange (accessed May 11, 2023).

CLASS ACTION COMPLAINT

Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[81]

172.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

> "You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[82]

173.    On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[83]

174.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

175.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[84] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested

---

[81] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[82] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[83] *Id.*

[84] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

CLASS ACTION COMPLAINT

participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[85]

176.     Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[86] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[87]

177.     Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. B ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

---

[85] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

[86] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[87] Id.

178.   As Mr. Sibenik explains, applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the Howey Test defines an investment contract as:
>
> a.   An investment of money
>
>> i.   Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.
>
> b.   In a common enterprise
>
>> i.   FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets,

cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c.   With the expectation of profit

    i.   FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[88]

d.   To be derived from the efforts of others

    i.   The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

    ii.   The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as

---

[88] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

Alameda) that would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

Ex. D, ¶ 43.

179. The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[89] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[90]

180. FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

---

[89] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[90] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

181.   The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

182.   On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.
> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

CLASS ACTION COMPLAINT

1    FTX US maintains a website at https://ftx.us that contains a
2    webpage for smartphone applications for FTX (formerly Blockfolio)[91]
3    (the "FTX Trading App") and FTX US Pro. Users appear able to click
4    a link in this webpage to download the FTX Trading App even when
5    they reside in the United States.

6        On October 14, 2022, I downloaded and installed the FTX
7    Trading App on my smartphone. I created an account with FTX
8    Trading through the FTX Trading App and linked the FTX account to
9    an existing personal bank account. During the process, I provided my
10   full first and last name and entered my residential address in Austin,
11   Texas. I also accessed hyperlinks in the FTX Trading App that
12   redirected to the Privacy Policy and Terms of Service. Although I was
13   from the United States and was using the application tied to FTX
14   Trading, the Privacy Policy and Terms of Service were from FTX US
15   - not FTX Trading.

16       I thereafter used the FTX Trading App to initiate the transfer of
17   $50.00 from my bank account to the FTX account and then transferred
18   .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds
19   from my bank account to the FTX account will take up to six days to
20   complete but the transfer of ETH was processed within a few minutes.

21       The FTX Trading App showed that I was eligible to earn a yield
22   on my deposits. It also explained the "Earn program is provided by
23   FTX.US" – not FTX Trading. It also represented that "FTX Earn
24   rewards are available for US users on a promotional basis."

25

26   [91] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August
     2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter
27   rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from
     Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in
28   Apple's App Store still shows the application with developed by Blockfolio.

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX

CLASS ACTION COMPLAINT

permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.
>
> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the

1    yield program appears to be an investment contract, evidence of

2    indebtedness and note, and as such appears to be regulated as a

3    security in Texas as provided by Section 4001.068 of the Texas

4    Securities Act. At all times material to the opening of this FTX

5    account, FTX Trading and FTX US have not been registered to offer

6    or sell securities in Texas. FTX Trading and FTX US may therefore

7    be violating Section 4004.051 of the Texas Securities Act. Moreover,

8    the yield program described herein has not been registered or

9    permitted for sale in Texas as generally required by Section 4003.001

10    of the Securities Act, and as such FTX Trading and FTX US may be

11    violation Section 4003.001 by offering unregistered or unpermitted

12    securities for sale in Texas. Finally, FTX Trading and FTX US may

13    not be fully disclosing all known material facts to clients prior to

14    opening accounts and earning yield, thereby possibly engaging in

15    fraud and/or making offers containing statements that are materially

16    misleading or otherwise likely to deceive the public. Certain principals

17    of FTX Trading and FTX US may also be violating these statutes and

18    disclosure requirements. Further investigation is necessary to

19    conclude whether FTX Trading, FTX US and others are violating the

20    Securities Act through the acts and practices described in this

21    declaration.

22        The Enforcement Division of the Texas State Securities Board

23    understands that FTX US placed the highest bid for assets of Voyager

24    Digital LTD et al., a family of companies variously accused of

25    misconduct in connection with the sale of securities similar to the

26    yield program promoted by FTX Trading and FTX US. FTX US is

27    managed by Sam Bankman-Fried (CEO and Founder), Gary Wang

28

(CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda
By: Joseph Jason Rotunda

**FTX's offer and sale of FTT Tokens, which are unregistered securities.**

183.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[92] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media

---

[92] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[93]

184.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[94] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[95]

**Using the Deceptive FTX Platform itself necessarily required transacting in unregistered securities.**

185.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the Deceptive FTX Platform.

186.    Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

---

[93] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[94] https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

[95] https://www.sec.gov/news/press-release/2020-338 (accessed May 11, 2023).

187.   When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

188.   Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

189.   According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between

Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[96]

190.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[97] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[98] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[99]

---

[96] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

[97] Id.

[98] Id.

[99] Id.

191.   To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[100] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[101] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[102]

192.   The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[103] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[104] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[105]

---

[100]   https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed May 11, 2023).

[101] FTX customers deposited more than $5 billion in those Alameda accounts.

[102] *Id.*

[103] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed May 11, 2023).

[104]   https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[105] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

193. It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

194. In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[106] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

**F. The Defendants Aggressively Marketed the FTX Platform**

195. From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting,

---

[106] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[107] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[108]

196.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[109] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[110] According to the United Nations, "money

---

[107]    https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[108] https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed May 11, 2023).

[109] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[110] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[111] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[112]

197.   Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[113] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed."

---

[111] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[112] Id.

[113] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[114]

198.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[115] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[116] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[117] The median individual loss was a staggering $2,600.

199.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains

---

[114] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[115] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[116] *Id.*

[117] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[118]

200.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[119]

201.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[120] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

202.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency.

203.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

---

[118] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[119] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[120] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

204.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[121] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial conversation with Mr. Fried.[122] Finally, after FTX's implosion, the FT reported that FTX held talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[123] While the article does not detail the reasons why Swift declined the FTX offer, it does include the following quote from a person close to the negotiations:

"Taylor would not, and did not, agree to an endorsement deal. The discussion was around a potential tour sponsorship that did not happen."[124]

205.    Subsequent reports indicate that Taylor Swift's team had inquired about whether FTX was selling unregistered securities, and did not receive a satisfactory answer.

206.    Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

"Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity

---

[121]    https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

[122]    https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

[123] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed May 11, 2023).

[124] Id.

and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[125]

207.   Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX did not have centralized control of its cash, 2.) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group, 3.) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

208.   It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic. Of course, the same can be said for prominent venture capital (VC) firms that invested in FTX. But these investors are in the business of taking risk and VC firms have an incentive to conduct limited due diligence lest they become known as unfriendly to founders and get locked out of future deals. The same "founder friendly" dynamics played a role in lapse due diligence at WeWork and Theranos.

209.   Furthermore, many customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being

---

[125]   https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed May 11, 2023).

compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

210.   Thus, celebrities like the Brand Ambassador Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

211.   In addition to the conduct of Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

212.   In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

213.   FTX's explanation for using stars like David, Osaka, and Ohtani was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[126]

214.   In other words, the FTX Group needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive

---

[126] https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).

the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

215.   The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

i.   **Defendant Shohei Ohtani**



216.   Shohei Ohtani is a global icon and history-making professional baseball superstar from Japan, most widely known for his versatility, playing successfully in the MLB as an outfielder, designated hitter, and pitcher. He currently plays for the Los Angeles Angels.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

### a. Ohtani Partnered with FTX to Promote Its Platform.

217.  On or about November 2021, Ohtani partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included appearing in a commercial and as a spokesperson for the brand.

218.  Ohtani's signed on as a long-term global ambassador with both FTX US and FTX International.[127]



219.  In exchange for these services, Ohtani received a substantial total compensation package.  Ohtani received all of his compensation in equity and cryptocurrencies. Because of his compensation structure, the more success that

---

[127]  https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed May 11, 2023).

Ohtani had in influencing consumers to make investments on the FTX platform, the more Ohtani stood to profit financially.

220. In an interview with CNN about the Ohtani partnership, Bankman-Fried stated: "We are really excited to give our partners a stake because it means we are aligned. As much as we are rooting for them on the field, hopefully they are rooting for us to do well in our arena."[128]

221. Ohtani did not disclose the form or amount of payments received under the agreement to the public when promoting FTX.

### b. Ohtani Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

222. Ohtani partnered with FTX and provided services in accordance with his agreement. For example, he appeared in commercials for FTX and acted as a spokesperson. Specific examples of his promotions of FTX follow:

223. On or about November 16, 2021, FTX shared the news of Ohtani's signing on its twitter account.



---

[128] https://www.cnn.com/2021/11/16/business/bitcoin-crypto-ftx-ohtani/index.html

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





224.     On or about January 31, 2022, FTX tweeted about its relationship with Ohtani, congratulating Ohtani for being on the cover of a MLV video game.



225.     On or about April 2022, Ohtani appeared in a commercial for FTX which poked fun at a contest he ran years prior to come up with his nickname. One

character in the commercial suggests, "The Great Cryptohani" since "he's also into crypto, NFTs."[129]

226.    Ohtani appeared in a second commercial that aired on or about August 2022 on regional and national television, which featured the claim that Ohtani "Hits. Pitches. Invests. Does it all on the platform that trades it all, FTX." That ad can be viewed at the following link: https://www.youtube.com/watch?v=Is72XSKuUqA.

227.    On or about August 1, 2022, FTX tweeted an image of an FTX billboard featuring Ohtani.



---

[129] https://www.thedrum.com/news/2022/04/07/ftx-dubs-mlb-all-star-shohei-ohtani-the-great-cryptohtani



228.    Ohtani also provided spokesperson services while playing for the Los Angeles Angels, including while playing against teams from Florida at home, and while playing against Florida teams in Florida, including but not limited to April 11-12, 2022 against Miami in Los Angeles, May 9-11, 2022 against Tampa Bay in Los Angeles, July 5-6, 2022 against Miami in Miami, and August 22-25, 2022 against Tampa Bay in Tampa.

229.    Commercials and promotional images were shared and re-broadcast across social media. Nationwide network, and local networks such as NBC Miami, routinely covered Ohtani's career. https://www.nbcmiami.com/tag/shohei-ohtani/

CLASS ACTION COMPLAINT

South Florida Sun Sentinel ✔
March 21 · 

Shohei Ohtani emerged from the bullpen and fanned Los Angeles Angels teammate Mike Trout for the final out in a matchup the whole baseball world wanted to see, leading Japan over the defending champion United States for its first World Baseball Classic title since 2009.

SUN-SENTINEL.COM
Shohei Ohtani fans Mike Trout, Japan tops US for WBC championship
Shohei Ohtani emerged from the bullpen and fanned Los Angeles Angels teammate Mike Trou...

230.    Because some social media posts have been removed, and some FTX resources are not publicly accessible, additional advertisements may be located in discovery.

231.    The overarching objective of the partnership was for Ohtani, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

232.    As Ohtani expected and understood when entering his partnership with FTX, his promotions would be widely viewed worldwide, including in Florida, where he knew or should have known FTX had its domestic home office

(including because the arena of the NBA's Miami Heat had been renamed 'FTX Arena').

233.    On information and belief, Ohtani also knew and anticipated that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but also that said promotions would be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c. Ohtani Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

234.    Ohtani had a financial incentive to induce Plaintiffs to invest with FTX. He was paid owned an equity stake in FTX, and was paid in cryptocurrency and equity – the value of which depended on the financial success of FTX.

235.    Further, Ohtani had every incentive to be effective promoters of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

### d. The Promotions Were Deceptive and Unlawful.

236.    Ohtani did not disclose that he was being compensated by FTX for promoting the sale of FTX securities.

237.    Ohtani made deceptive statements in his promotions, including statements that he "does it all on the platform."

### e. Ohtani Knew or Should Have Known He Was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities, and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.

238.    Given Ohtani's experience with sponsorship deals and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to

millions of his fans. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

**f. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

239.    Ohtani's promotions were published on public social media accounts and aired on local and national television broadcasts. They were accessible to plaintiffs nationwide, including in Florida.

240.    The partnership between FTX and Ohtani specifically targeted Florida residents because Ohtani played MLB games in Florida, and against Florida teams in Los Angeles – both of which were covered by Florida media – while acting as a brand ambassador for FTX.

**ii.  <u>Defendant Naomi Osaka</u>**



**a. Naomi Osaka Partnered with FTX to Promote Its Platform.**

241.    Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[130]

---

[130]    https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed May 11, 2023).

242.    Ms. Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open. [131]

243.    Ms. Osaka and FTX launched a commercial designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses. Ms. Osaka did not properly disclose that she was being compensated by the entity offering and selling the security

244.    Ms. Osaka's essential objective as an FTX ambassador, for which he was highly compensated, was ultimately to assist FTX in its campaign to solicit investments in crypto-related securities offered on its platform.

245.    In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Ms. Osaka directed and produced content in association with the FTX Group designed to promote the offer and sale of the unregistered Deceptive FTX Platform, YBAs and/or FTT securities, hoping "she will reach a global audience."[132]

**b. Naomi Osaka Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

246.    Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her 1.1 million Twitter followers, which can be viewed here: https://www.youtube.com/watch?v=w0dLcBDuq5A

---

[131] *Id.*

[132] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   247.   It shows the tennis star competing in a comic-strip. Accompanied by
16   overly dramatic music, she says: she says: "They thought they made the rules for
17   us. They thought they could control us. They were wrong."

18   248.   The video then cuts to a boardroom full of marketing executives
19   talking about the ad in a tongue-in-cheek way — and discussing other ideas…
20   including Osaka heading to the moon. An idea to have a QR code bouncing around
21   the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being
22   "boring."

23   249.   They settle on letting Osaka speaking for herself — and play a mock-
24   up of the tennis ace giving an interview to a news channel where she says: "I'm
25   Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency
26   accessible is a goal that FTX and I are striving towards." The ad ends with the
27   tagline: "Naomi is in. You in?"

28

250.     Osaka, in accord with her partnership agreement with FTX, engaged in a sustained and aggressive promotion campaign, specifically targeting vulnerable young woman in a perverse attempt to mitigate societal inequality.[133]

251.     As part of this partnership, Osaka was tasked with producing content that would "focus on bringing women on the platform" and to "further democratize the space."[134]

252.     Furthermore, Osaka wore tennis gear with the FTX logo on it following her announcement, starting with the 2022 Miami Open, including the during the final.



[133] https://www.hollywoodreporter.com/business/digital/naomi-osaka-crypto-ftx-1235115487/ (accessed May 8, 2023).

[134] Id.





CLASS ACTION COMPLAINT

253.    After winning her quarter-final and semi-final match, Osaka tweeted pictures of herself celebrating, while wearing the tennis gear with the FTX logo.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    **c. Naomi Osaka Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

    254.    Osaka had a financial incentive to induce Plaintiffs to invest with FTX. She held an equity stake in FTX– the value of which depended on the financial success of FTX.

 



**Naomi Osaka**

Athlete. Entrepreneur. Advocate. Icon. Four-time Grand Slam singles champion and recipient of seven titles on the WTA Tour, Naomi is now an FTX shareholder and ambassador.

255.    Further, Osaka had every incentive to be effective promoters of FTX in order to continue the ambassador relationship and continue receiving payment for their services.

256.    Moreover, Osaka received compensation in crypto. The value of cryptocurrencies were inextricably linked to the success of FTX trading platform, providing Osaka with even greater incentive to ensure the success of FTX.

### d. The Promotions were Deceptive and Unlawful.

257.    Osaka's partnership agreement with FTX provided her with an equity stake in FTX. Because of her compensation structure, the more success that Ms. Osaka had in influencing consumers to make investments on the FTX platform, the more Ms. Osaka stood to profit financially.

258.    FTX's success was, in part, conditional upon Osaka's ability to use her fame and platform to bring vulnerable investors, especially women, into FTX's fray.

@naomiosaka will wear the FTX logo during competitions, starting with today's Miami Open.



259.   Osaka had a great incentive to engage in deceptive and unlawful promotions in order to ensure the financial success of FTX.

260.   Given her resources, access to advisors and outside counsel, and her prior investment experience, Osaka knew or should have known that the promotions she engaged in were deceptive and unlawful.

**e.  Naomi Osaka Knew or Should Have Known She was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or the She was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

261.   Given Osaka's substantial investment experience, including with Sweetgreen and DraftKings, and the vast resources to obtain outside advisors (which she had), she knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that she was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of their followers.

**f.  The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

262.   Osaka's promotions were published on public social media accounts, and aired on local and national television broadcasts. They were accessible to plaintiffs nationwide, including in Florida.

263.   Moreover, the partnership between FTX and Osaka specifically targeted Florida residents because she began her promotion campaign at the 2022 Miami Open tennis tournament.

264.   Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

265.   The overarching objective of the partnership was for Ms. Osaka, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors inf FTX's crypto-related securities from Florida and nationwide

266.   As Ms. Osaka expected and understood when entering its partnership with FTX, her promotions would be widely viewed nationwide, including in Florida, where she knew or should have known FTX had its domestic home office (including because the first major tennis event where she wore FTX gear was at the 2022 Miami Open, where she lost in the finals).

267.   On information and belief, Ms. Osaka also knew and anticipated that her promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.



### iii.    Defendant Larry David



### a.  Larry David Worked with FTX to Promote its Platform

268.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Group called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl.

269.    The ad—the only commercial David has ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "<u>Don't</u> be like Larry." The ad can be viewed here: https://www.youtube.com/watch?v=hWMnbJJpeZc

270.    Larry David was first approached to take part in the FTX Super Bowl commercial in the Fall of 2021.[135]

271.    Although David "gets asked to do commercials 'pretty regularly'" he had, until that point, declined to appear in any due to creative disagreements between himself, on the one hand, and advertisement agencies and executives, on the other.

---

[135]    https://variety.com/2022/tv/news/larry-david-super-bowl-commercial-ftx-cryptocurrency-jeff-schaffer-1235180358/ (accessed May 8, 2023).

272.    However, that all changed after David learned about FTX's idea. Indeed, David and his long-time collaborator "were completely in lockstep with" FTX's idea of using the contrarian comic's well-known wit and persona to advertise the emerging crypto exchange app and reach a wide-pool of potential users.

273.    Indeed, embracing David's constructed antagonism for cryptocurrency was part of FTX's broader, manipulative marketing strategy. According to Bankman-Fried, FTX wanted to "meet people where they are—and that means embracing skepticism."

**b. Larry David Engaged in a Sustained and Aggressive Advertising Campaign.**

274.    The FTX Super Bowl ad features an exaggerated version of Larry David in various historical contexts, deriding inventions such as the wheel, the fork, electricity, the toilet, and democracy.

275.    It concludes with an individual sitting in Larry David's office holding an iPhone with the FTX logo, stating, "like I was saying, it's FTX, a safe and easy way to get into crypto."

276.    David responds "I don't think so. And I'm never wrong about this stuff. Never."

277.    The advertisement concludes with the commercial's tagline: Don't Be Like Larry.

278.    The clear implication from the commercial is to reject David's hesitancy and invest in crypto through FTX's "safe and easy" online platform.

279.    The commercial was extremely popular following its original airing. Following its airing, FTX became one of the most retweeted brands during the

Super Bowl, and won the "Most Comical" honorific from *USA Today*'s Ad Meter.[136]

280.   Following the commercial, David and his team provided interviews with the *New York Times* and *Variety Magazine* where they discussed the process of making the commercial and their enthusiasm when first approached.[137]

### c.   Larry David Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform

281.   While David was no doubt excited to showcase his creativity to a broader audience, it came at a serious cost. He used his celebrity, fame, and comedic wit to advertise and promote a risky financial device to millions of unsophisticated and vulnerable potential investors.

282.   But David did not care. The vast viewership provided by an event like the Super Bowl provided him with a massive crowd of viewers with their eyes glued to their television screens.

283.   David had a financial incentive to induce Plaintiffs to invest with FTX. In exchange for his comedic wit and acting services, Mr. David was substantially compensated. Indeed, upon information and belief, hiring David almost doubled the already hefty $13 million price tag of a prime-time Super Bowl commercial.[138]

284.   Further, David had every incentive to be an effective promoter of FTX in order to continue the creative relationship and have more opportunities to work with FTX in the future.

### d.   The Promotions were Deceptive and Unlawful

---

[136]   https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed May 11, 2023).

[137]   See *supra* 144; https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

[138]   https://www.theblock.co/post/134339/why-larry-david-was-the-perfect-anti-sponsor-of-ftxs-super-bowl-ad-according-to-jeff-schaffer (accessed May 8, 2023)

285.    Given David's resources and access to advisors and counsel, he knew or should have known that FTX's platform was built atop a fragile house of cards.

286.    Because David knew or should have known about FTX's financial fragility, his promotion of the FTX platform as an "easy and safe way to get into crypto" was deceptive and unlawful.

**e. Larry David Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

287.    Given David's investment experience and vast resources to obtain outside advisors (which he had), David knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

288.    David agreed to be a part of the advertisement in November 2021, yet failed to properly investigate the brand and product he was tasked with promoting to hundreds of millions of people.[139]

**f.    The Promotions were Directed at Plaintiffs in Florida, and Customers Nationwide**

289.    First, as explained above, the deal with David for the Super Bowl commercial was created, consummated, implemented, and/or overseen by FTX VP of Business Development Avi Dabir, from his base of operations in Miami, Florida. *See* Exs. B, C.

---

[139] https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

290.    The Super Bowl is one of the most watched events in the United States, regularly generating close to 100 million viewers through traditional television networks and modern online streaming platforms.

291.    Indeed, the 2022 Super Bowl had 99.18 million television viewers and 11.2 million streaming viewers. This provided David and FTX a perfect opportunity to expose over 100 million individuals to FTX's deceitful scheme.[140]

292.    Due to its national reach, millions of Florida residents also watched the 2022 Super Bowl. According to Nielsen ratings, for example, the city of Jacksonville, Florida, the most populous city-proper in the state, had the tenth highest local market rating in the country.[141]

293.    But it did not stop there. According to the official FTX Twitter account, the commercial had been viewed close to 50 million times by April 30, 2022, less than two months after it aired on February 13th:



---

[140] https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/ (accessed May 8, 2023).

[141] https://thespun.com/more/top-stories/the-10-u-s-cities-that-had-most-super-bowl-56-viewers (accessed May 7, 2023).

294. The ad was (and is to this day) still being shared all across YouTube, ensuring its impact months after the original air date.[142]

295. Furthermore, according to data analytics and software company Edo, Inc., David's ad had a 6.5x greater consumer engagement than the median Super Bowl ad.[143] Consumer engagement was also driven by a promotion by FTX, where they promised to give away Bitcoin if social media users followed the FTX twitter account and "retweeted the ad".[144]

296. Moreover, FTX strategically bought an advertisement slot right before the end of the first-half, before the Super Bowl half-time show. This primetime spot ensured that even viewers with little to no interest in the game would be tuning in to watch the musical performance, which featured an array of hip-hop icons including Snoop Dogg, Dr. Dre, Eminem, and 50 Cent.

297. FTX's plan worked. David's comedic charm enthralled potential investors, and FTX saw a 130% boost in downloads week-over-week on February 13, followed by 80% growth the next day.[145] The FTX app jumped up Apple's App Store download rankings right after the Super Bowl, and eventually surpassed.[146]

---

[142] https://www.youtube.com/watch?v=hWMnbJJpeZc (accessed May 8, 2023); https://www.youtube.com/watch?v=FEX64-2Tphw (accessed May 8, 2023); https://www.youtube.com/watch?v=PmhOBkmJjpM (accessed May 8, 2023).

[143] https://www.globenewswire.com/news-release/2022/02/14/2384508/0/en/Super-Bowl-LVI-Sees-Advertising-Boom-as-Marketers-Get-Back-in-the-Game.html (accessed May 8, 2023)

[144] https://www.globenewswire.com/news-release/2022/02/14/2384508/0/en/Super-Bowl-LVI-Sees-Advertising-Boom-as-Marketers-Get-Back-in-the-Game.html (accessed May 8, 2023)

[145] https://techcrunch.com/2022/02/17/super-bowl-ads-boosted-crypto-app-downloads-by-279-led-by-coinbase/ (accessed May 9, 2023).

[146] https://www.protocol.com/bulletins/coinbase-super-bowl-results (accessed May 8, 2023).

iv.   **Defendant TSM**



298.   FTX's TSM is the most valuable esports organization in the world, an elite, holistic gaming brand comprised of championship esports teams, world-class influencers, and gaming strategy sites that level up the entry-level player all the way to professional.[147] Self-described as a "platform of champions," TSM seeks to provide maximum value through the competitive excellence of its teams and the creation of exciting, educational, and entertaining content that deliver the ultimate esports and gaming fan experience.

**a.  TSM Partnered with FTX to Promote its Platform.**

299. "Esports," or competitive video gaming, have experienced a meteoric rise in popularity over the past few years, particularly with younger audiences. Once considered a niche hobby, esports have become a global phenomenon with millions of viewers and participants worldwide. The growth of esports has been fueled by several factors, including the proliferation of online streaming platforms,

---

[147] https://www.crunchbase.com/organization/team-solomid (accessed May 11, 2023).

the increasing accessibility of gaming technology, and the emergence of professional leagues and teams.

300. One of the main reasons why esports have become so popular with younger audiences are their accessibility. Unlike traditional sports that require specialized equipment and physical abilities, esports only require a computer or gaming console and an internet connection. This makes it easier for younger people to participate in esports from the comfort of their own homes. Additionally, many games that are popular in esports, such as League of Legends and Fortnite, are free to play, which further lowers the barrier to entry.

301. Another factor that has contributed to the rise of esports is the widespread availability of online streaming platforms such as Twitch and YouTube. These platforms have made it easier than ever for fans to watch their favorite esports tournaments and events from anywhere in the world. They have also provided a platform for amateur players to showcase their skills and build a following, which can help them break into the professional scene.

302. The emergence of professional leagues and teams has also played a significant role in the rise of esports. Major companies such as Activision Blizzard, Riot Games, and Epic Games have invested heavily in creating structured leagues and tournaments for their respective games. This has helped to professionalize the industry and provide more opportunities for aspiring players to make a career in esports. These professional leagues and teams have also attracted major sponsors and investors, which has helped to raise the profile of esports even further.

303. When it comes to esports, TSM is a name that cannot be overlooked. Founded in 2009 by Andy "Reginald" Dinh, TSM has become one of the most successful esports organizations in the world. With teams in games such as League of Legends, Valorant, and Fortnite, TSM has won multiple championships and established itself as a titan in the industry.

304. TSM is perhaps best known for its role in popularizing esports in the United States. TSM was one of the first organizations to bring esports to a mainstream audience in North America, and it helped to establish a competitive scene in games such as League of Legends, paving the way for other esports organizations and players in the region. TSM's success and popularity has helped to legitimize esports as a legitimate form of entertainment and competition, attracting major sponsors and investors to the scene.

305. In recent years, TSM made headlines in the esports industry with its groundbreaking partnership with FTX. On June 4, 2021, TSM announced a 10-year, $210 million naming rights deal with FTX. The deal included requirements for TSM to purchase $1 million of FTX's native security, FTT, which TSM used to pay its employees and players, and options for employees to purchase Solana on FTX US exchanges and be reimbursed by FTX. *See* https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (Last visited May 11, 2023); *see also* https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (Last visited May 11, 2023). This multi-year, multimillion-dollar deal not only highlighted the growing influence of esports but also showcased the increasing involvement of cryptocurrency and blockchain technology in the industry.

306. FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served an important centerpiece for FTX's efforts to form partnerships with ambassadors like TSM.

307. FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and promotors was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

308. Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from FTX's Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with TSM.

309. On information and belief, the negotiation and execution of the TSM agreement with FTX involved communications between TSM and Mr. Dabir in FTX's offices in Miami. On information in belief, TSM understood the counterparty to the contractual negotiations based its domestic operations in Florida.

310. The collaboration between TSM and FTX marked one of the largest sponsorship deals in esports history. The partnership involved the complete rebranding of TSM, a strong brand name synonymous to North American esports, with the team officially becoming "TSM FTX." This partnership between TSM and FTX is significant for several reasons.

311. First, it demonstrated the increasing mainstream acceptance of esports as a valuable marketing platform to access millions of viewers. FTX recognized the immense reach and engagement of esports audiences, particularly among younger demographics, and saw an opportunity to align its brand with one of the most successful esports organizations in the world, further solidifying the notion that esports had become a lucrative avenue for companies looking to connect with younger audiences.

312. Second, the collaboration highlighted the growing presence of cryptocurrency and blockchain technology in the esports ecosystem. As part of the deal, FTX secured naming rights for TSM's training facility, which was renamed the "FTX Training Center." FTX's involvement showcased the potential synergies between esports and cryptocurrency, as both industries catered to a tech-savvy and digitally native audience. This partnership also provided FTX with an opportunity to reach a younger demographic through the esports audience and a platform for

FTX to raise awareness about cryptocurrencies and blockchain technology among millions of esports fans and participants worldwide.

313. Third, with esports fans and participants primarily composed of millennials and Gen Zers, the partnership with TSM helped FTX connect with a younger demographic that is more receptive to cryptocurrency and blockchain technology. This partnership helped to integrate the FTX brand into the TSM ecosystem, providing greater visibility and exposure to FTX's target audience and previously skeptical investors.

314. Fourth, the partnership also provided FTX with a platform to educate esports fans and participants about cryptocurrency and blockchain technology. FTX conducted educational campaigns and promotions during esports events, showcasing the potential benefits of using cryptocurrency and blockchain for esports transactions and sponsorships. The partnership allowed FTX to establish a foothold in the esports industry and build brand recognition among a tech-savvy and digitally native audience.

315. Furthermore, TSM's success in esports helped to increase FTX's credibility and legitimacy as a sponsor and partner. TSM has a large and passionate fanbase, known as the "TSM Army," that is highly engaged and loyal to the brand. By aligning with TSM, FTX was able to tap into this fanbase and leverage their enthusiasm to promote FTX's brand and offerings. This helped FTX gain greater credibility and acceptance among esports fans and participants, who tend to be skeptical of traditional forms of advertising.

316. In the end, the exposure to younger demographics and tech-forward TSM fans was not a positive for either the cryptocurrency or esports industries. TSM had been promoting unregistered securities in the name of one of the largest financial fraudsters in recent memory. Through this partnership, the champion of cryptocurrency in the gaming industry lost money for countless members of the

TSM Army. Not only did fans lose their entire investments coffers, but any fan that also followed TSM's lead and purchased the unregistered security FTT has witnessed their investment change from $34 per security to slightly over $1 each, as of the date of filing. *See* https://cointelegraph.com/news/ftx-crypto-exchange-seals-210m-naming-rights-deal-for-esports-behemoth-tsm/amp (Last accessed May 10, 2023).

### b. TSM Engaged in a Sustained and Aggressive Advertising Campaign.

317.    On June 3, 2021, for $210 million paid equally on an annual basis over the course of 10 years, TSM announced that it was changing its name to TSM FTX.[148] The deal was debuted with a fancy video describing how the relationship started – TSM's CEO, Andy Dinh, and FTX's chief executive, Bankman-Fried, have a shared passion for "League of Legends."[149] This was, at the time, the one of the largest sports deals in existence, made with the most valuable e-sports company in the United States, in the middle of the COVID-19 Pandemic and on the heels of FTX's FTX Arena deal.[150] In short, the deal caused FTX Group's popularity to skyrocket, helping to catapult it to the forefront of the nascent crypto exchange industry.

318.    Esports was exploding in popularity, with people stuck at home searching for online entertainment and ways to invest and make money, sometimes in unconventional (and risky) ways.[151] Interest in video games had increased significantly over the year leading up to the announcement — including in e-sports, where some professional players make millions of dollars and vie for

---

[148] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

[149] https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (accessed May 11, 2023)

[150] *Id.*; *see also* https://www.forbes.com/sites/christinasettimi/2020/12/05/the-most-valuable-esports-companies-2020/ (accessed May 11, 2023).

[151] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

championships in leagues devoted to games like Fortnite and League of Legends.[152] More than 57 million people in North America watched an e-sports event in 2020, according to Newzoo, a gaming analytics firm.[153]

319.    As part of its deal with FTX, TSM announced that "TSM FTX will distribute cryptocurrency to each of its players and employees" and would purchase "$1 million worth of FTT, FTX's native token" and distribute cryptocurrency to its players and employees.[154]   At that time, the price per FTT hovered as just under $35 – by November 16, 2022, it dropped to under $2.[155]

320.    TSM's success in esports helped to increase FTX's credibility and legitimacy as a sponsor and partner. TSM has a large and passionate fan base, known as the "TSM Army," that is highly engaged and loyal to the brand. By aligning with TSM, FTX was able to tap into this fanbase and leverage their enthusiasm to promote FTX's brand and offerings. This helped FTX gain greater credibility and acceptance among esports fans and participants, who tend to be skeptical of traditional forms of advertising.

321.  As part of its partnership with FTX, TSM ran promotions like the first ever TSM FTX Aurory NFT release deal, where TSM announced on October 1, 2021, the creation of the org's first-ever collection of NFTs, designed by Aurory, the blockchain-based game and NFT ecosystem.[156]

322.    The four individual NFTs were a collaboration with Aurory, a PvE/PvP gaming project that uses NFTs powered by the cryptocurrency Solana and

---

[152] *Id.*

[153] *Id.*

[154] https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (last accessed May 11, 2023)

[155] https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (last accessed May 11, 2023)

[156] https://web.archive.org/web/20220331024235/https://tsm.gg/news/first-ever-tsm-ftx-aurory-nft-release-deal-crypto-esports (accessed May 11, 2023).

Serum.[157] The tokens, also known as 'Aurorians,' are each sporting TSM merch and apparel, including the iconic 2017 LCS-winning jersey and the brand-new 2021 version featuring the TSM FTX logo.[158] These exclusive avatars have multiple functions both in and out of the game, including acting as a player's visual identity, allowing owners early access to play future game modes before they are made public, exclusive access to special modes and rewards, and much more.[159]



323.    As part of its partnership with FTX, TSM team members actively promoted FTX to a broader audience, beyond just the esports community. TSM's roster of players and content creators have a substantial following on social media platforms such as Twitter, Instagram, and YouTube, which they utilized to amply promote FTX and its products.

324.    TSM team members created content promoting FTX's offerings and educational campaigns around cryptocurrency and blockchain technology. This content included sponsored social media posts, videos, and live streams, which showcased FTX's logo and brand messaging to their followers, helping FTX gain greater visibility and reach among a broader audience, beyond just esports fans.

325.    TSM team members also actively engaged with FTX's audience through social media and other platforms, providing feedback and responding to

---

[157] Id.

[158] Id.

[159] Id.

queries related to cryptocurrency and blockchain technology. This helped FTX to build trust and credibility with its audience, as TSM team members are widely respected and trusted by their fans.

326.    TSM team members also used their personal brands to create buzz and excitement around FTX's sponsorship deals with other organizations and sports teams, further extending FTX's reach and impact. This approach helped to position FTX as a leader in the sports and entertainment industry, and helped to solidify the brand's place in the minds of consumers and investors.

327.    As TSM expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where TSM knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

328.    On information and belief, TSM also knew and anticipated that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c. TSM Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform

329.    TSM, as one of the most identifiable esports brands, used its broad global reach to advertise and promote a risky financial device to its users -- millions of unsophisticated and vulnerable potential investors, particularly in the 18-to-34 year age range.[160] It was paid by FTX not only to promote the brand through placing FTX logos on jerseys, team branding, and social media, but changed its actual name

---

[160] https://dataprot.net/statistics/gamer-demographics/#:~:text=The%20demographic%20of%20gamers%20that,18%20and%20%2034%20years%20old.&text=The%20average%20esports%20fan%20is,older%20member%20of%20Generation%20Z (last accessed May 11, 2023)

– "the equivalent of the New England Patriots, who play in Gillette Stadium, rebranding as the New England Patriots Gillettes."[161]

330.    TSM had a financial incentive to induce Plaintiffs to invest with FTX. At the time FTX and TSM announced their deal, TSM's CEO Andy Dinh said that the deal "gives us [TSM] a strong foothold to really grow our brand globally." TSM reportedly used its sponsorship funds to attract start players with higher salaries and open offices in China, Europe and South America.[162]

331.    Further, TSM had every incentive to be an effective promoter of FTX in order to continue the symbiotic relationship and have more opportunities to work with FTX in the future.

**d.  The Promotions were Deceptive and Unlawful**

332.    Given TSM's resources and access to advisors and counsel, TSM knew or should have known that FTX's platform was built atop a fragile house of cards.

333.    Because TSM knew or should have known about FTX's financial fragility, its promotion of FTX platform as an "easy and safe way to get into crypto" was deceptive and unlawful.

**e.  TSM Knew or Should Have Known It was Soliciting or Assisting FTX to Solicity Investments in Unregistered Securities and/or that it was Aiding and Abetting FTX Group's Fraud and/or Conversion**

334.    Given TSM's prominence and vast resources to obtain outside advisors (which it had), TSM knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that it was aiding and abetting FTX Group's fraud and/or conversion, especially to the tens of millions of its users. This is especially true in light of the rampant mismanagement and myriad

---

[161] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (last accessed May 11, 2023)

[162] https://www.sportsbusinessjournal.com/Daily/Issues/2021/06/07/Technology/tsm-esports-signs-210-million-sponsorship-with-ftx-crypto-exchange (last accessed May 11, 2023)

red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

335.    TSM agreed to be a part of the advertisement in June 2021, yet failed to properly investigate the brand and product it promoted to tens of millions of people.[163]

336.    To ensure regulatory compliance, at a minimum, TSM must have conducted due diligence to understand how FTX was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure FTX was not selling or offering to sell securities. TSM disregarded their obligations to themselves and their fans.

### f. The Promotions were Directed at Plaintiffs in Florida, and Customers Nationwide

337.    First, as explained above, the deal with TSM was created, consummated, implemented, and/or overseen by FTX VP of Business Development Avi Dabir, from his base of operations in Miami, Florida. *See* Exs. A, B.

338.    TSM is one of the largest, if not the largest, esports organizations with a global reach.

339.    TSM's place at the top of the sports industry provided it and FTX a perfect opportunity to expose millions of individuals to FTX's deceitful scheme.[164]

340.    Due to its international reach, millions of Florida residents who are users of TSM were exposed to the FTX promotion.

### CLASS ACTION ALLEGATIONS

341. As detailed below in the individual counts, Plaintiffs bring this lawsuit

---

[163] https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

[164] https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/ (accessed May 8, 2023).

on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.    Class Definitions**

342.    Plaintiffs seek to represent the following Global Classes, if the Court finds Florida's securities statutes apply to all class members, or in the alternative Plaintiffs Kavuri, Gallant, and Nicol seek to represent the following International Classes and Plaintiffs Garrison, Podalsky, Lindeen, and Chernyavsky seek to represent the following Nationwide Classes, if the Court finds Florida's securities statutes apply to all class members, or in the alternative Plaintiffs Garrison, Podalsky, Lindeen, and Chernyavsky seek to represent the following State Subclasses (collectively, "the Classes"), under their respective state laws:

(1) **Global Class I:** All persons and entities who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

(2) **Global Class II:** All persons and entities who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

**In the Alternative:**

(3) **International Class I:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

(4) **International Class II:** All persons or entities residing outside the United States who, within the

applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

(5) **Nationwide Class I:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

(6) **Nationwide Class II:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

**In the Alternative:**

(7) **Florida Subclass I:** All persons or entities in the State of Florida who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

(8) **Florida Subclass II:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

(9) **Oklahoma Subclass I:** All persons or entities in the state of Oklahoma who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

CLASS ACTION COMPLAINT

**(10)** **Oklahoma Subclass II:** All persons or entities in the state of Oklahoma who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

343.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.    Numerosity**

344.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently

unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## C.   Commonality/Predominance

345.   This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b) whether the Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c) whether the Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d) whether the Deceptive FTX Platform, YBAs and/or FTT were unregistered securities under federal or Florida law;

(e) whether Defendants' participation and/or actions in FTX's offerings and sales of the Deceptive FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law.

(f) the type and measure of damages suffered by Plaintiffs and the Class.

(a) whether Defendants' practices violate the FDUTPA;

(b) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(c) whether Plaintiffs and Class members are entitled to injunctive relief;

(d) whether Plaintiffs and Class members are entitled to declaratory relief; and

(e) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## D.    Typicality

346.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's Deceptive FTX Platform, YBAs and/or FTT because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, that Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## E.    Adequacy of Representation

347.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

348.   The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

349.   The common course of conduct by Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the Deceptive FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

350.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

351.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

352.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(2)**

353.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

354.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret

1  undisclosed compensation for their promotion of the Deceptive FTX Platform,

2  thereby making appropriate final injunctive relief or declaratory relief with respect

3  to the classes as a whole.

4  **I.     Requirements of Fed. R. Civ. P. 23(c)(4)**

5      355.   As it is clear that one of the predominant issues regarding Defendants'

6  liability is whether the Deceptive FTX Platform, YBAs and/or FTT that FTX

7  offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the

8  Class for a class wide adjudication on this issue would materially advance the

9  disposition of the litigation as a whole.

10     356.   As it is clear that another predominant issue regarding Defendants'

11  liability is whether they have violated the consumer protection and securities laws

12  of Florida in making identical and uniform misrepresentations and omissions

13  regarding the functionality of the Deceptive FTX Platform, and/or in receiving

14  secret undisclosed compensation for their promotion of the Deceptive FTX

15  Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication

16  on this issue would materially advance the disposition of the litigation as a whole.

17  **J.     Nature of Notice to the Proposed Class.**

18     357.   The names and addresses of all Class Members are contained in the

19  business records maintained by FTX and are readily available to FTX. The Class

20  Members are readily and objectively identifiable. Plaintiffs contemplate that notice

21  will be provided to Class Members by e-mail, mail, and published notice.

22

23

24

25

26

27

28

## THE GLOBAL OR NATIONWIDE CLAIMS, OR IN THE ALTERNATIVE, THE FLORIDA CLAIMS

## COUNT ONE

**Violations of the Florida Statute Section 517.07,
The Florida Securities and Investor Protection Act
(Plaintiffs Individually and on behalf of the Global Classes, or in the
alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano
Individually and on behalf of the Nationwide Classes, or in the alternative,
Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida
Subclasses)**

358.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

359.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

360.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

361.   The Deceptive FTX Platform, YBAs and/or FTT are each a security pursuant to Fla. Stat. § 517.021(22)(a).

362.   The Deceptive FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiff and Class members were not:

a.   exempt from registration under Fla. Stat. § 517.051;

b.   a federal covered security;

c.   registered with the Office of Financial Regulations (OFR); or

d.   sold in a transaction exempt under Fla. Stat. § 517.061.

363.   The FTX Group sold and offered to sell the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class.

364.   Defendants are directors, officers, partners and/or agents of the FTX Group pursuant to Fla. Stat. § 517.211.

365.   The FTX Group, with Defendants' material assistance and personal participation, offered and sold the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.***
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

366.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

367.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

CLASS ACTION COMPLAINT

368.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

369.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

370.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

371.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

372.    Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

373.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

374.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

375.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

1

2

**COUNT THREE**

3

**Civil Conspiracy**

4

**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

5

6

376.    Plaintiffs repeat and re-allege the allegations contained in paragraphs

7

1–313 above, as if fully set forth herein.

8

377.    The FTX Group and Defendants made numerous misrepresentations

9

and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform

10

in order to induce confidence and to drive consumers to invest in what was

11

ultimately a Ponzi scheme, misleading customers and prospective customers with

12

the false impression that any cryptocurrency assets held on the Deceptive FTX

13

Platform were safe and with material misrepresentations and/or omissions

14

regarding how customer funds would be used. Defendants knew these statements

15

to be false.

16

378.    The FTX Group entered into one or more agreements with Defendants

17

with the purpose of making these misrepresentations and/or omissions to induce

18

Plaintiff and consumers to invest in the YBAs, FTT and/or use the Deceptive FTX

19

Platform. Defendants each stood to benefit financially from assisting with this

20

fraud as each would receive the financial and other benefits described hereinabove.

21

379.    Defendants engaged in unlawful acts with the FTX Group, namely,

22

the misrepresentations and omissions made to Plaintiffs and the Classes and the

23

sale of unregistered securities as further described hereinabove.

24

380.    Defendants' conspiracy substantially assisted or encouraged the

25

wrongdoing conducted by the FTX Group; further, Defendants had knowledge of

26

such fraud and/or wrongdoing, because of their experience and relationship with

27

the FTX Group, as described above and as such, knew that the representations made

28

CLASS ACTION COMPLAINT

to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

381. Defendants' conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR

### Aiding and Abetting Fraud

**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

382. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 as if fully set forth herein.

383. The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

384. Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

385.    Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

386.    Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

387.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIVE

### Aiding and Abetting Conversion

**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

388.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 as if fully set forth herein.

389.    The funds deposited by Class Members into the Deceptive FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

390.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

391.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

392.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

393.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT SIX

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

### (Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)

394.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 above as if fully set forth herein.

395.    This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq*.

396.    There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse

1   and antagonistic interest in the subject matter; and the antagonistic and adverse

2   interests are all before the Court by proper process for final resolution.

3         397.   Plaintiffs and the members of the Classes have an obvious and

4   significant interest in this lawsuit.

5         398.   Plaintiffs and members of the Classes purchased Deceptive FTX

6   Platform, YBAs and/or FTT, based in part on justifiable reliance on the

7   Defendants' misrepresentations and omissions regarding the Deceptive FTX

8   Platform as further described hereinabove.

9         399.   If the true facts had been known, including but not limited to that the

10   Deceptive FTX Platform, YBAs and/or FTT are unregistered securities, the

11   Deceptive FTX Platform does not work as represented, and Defendants were paid

12   exorbitant sums of money to peddle the Deceptive FTX Platform to the nation,

13   Plaintiffs and the Classes would not have used the Deceptive FTX Platform and/or

14   purchased YBAs and/or FTT in the first place.

15         400.   Thus, there is a justiciable controversy over whether the Deceptive

16   FTX Platform, YBAs and/or FTT were sold illegally, and whether the Defendants

17   illegally solicited their purchases from Plaintiff and the Class.

18         401.   Plaintiff and the Class seek an order declaring that the Deceptive FTX

19   Platform, YBAs and/or FTT were securities required to be registered with the SEC

20   and state regulatory authorities, that the Deceptive FTX Platform did not work as

21   represented, and Defendants were paid exorbitant sums of money to peddle FTX

22   to the nation.

| THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS |
|---|

### f.   COUNT SEVEN

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, *et seq.***
**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

402.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

403.    California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

404.    Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

405.    The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

406.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

### g.  <u>COUNT EIGHT</u>

**Violations of the California Securities Law**
**Cal. Corp. Code §§ 25110 *et seq*.**
**(In the alternative, Plaintiff Piano individually and on behalf of the California Subclasses)**

407.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

408.   Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

409.   Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503. [52]

410.   Moreover, CSL section 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

---

[52]   Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 255030 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the Deceptive FTX Platform, the YBAs and/or FTT Tokens.

CLASS ACTION COMPLAINT

411.   Defendants breached section 25210(b) by encouraging the FTX Group to offer and sell the Deceptive FTX Platform, YBAs and/or FTT Tokens Securities despite the fact that such securities were not qualified under the CSL.

412.   Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

413.   Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section § 25504.1.

414.   Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 25503.

## COUNT NINE

### Aiding and Abetting Fraud

### (In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)

415.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 as if fully set forth herein.

416.   The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

417.   Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and

1  omissions to invest in cryptocurrency through the Deceptive FTX Platform to their

2  detriment.

3       418.   Defendants participated in, substantially assisted, and facilitated

4  Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct,

5  with knowledge that such fraud was cheating investors. For example, while either

6  knowing or consciously disregarding Bankman-Fried's and the FTX Group's and

7  Insiders' misconduct and red flags, Defendants still promoted and/or solicited the

8  Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as

9  described hereinabove, making the various misrepresentations and omissions as set

10  forth hereinabove.

11       419.   Defendants substantially benefitted from Bankman-Fried's, the FTX

12  Insiders', and FTX Group's scheme, as described herein.

13       420.   Plaintiffs and the Class members suffered damages as a direct and

14  proximate result of each of Defendants aiding and abetting the fraudulent scheme,

15  in an amount to be determined at trial.

16  ## COUNT TEN

17  **Aiding and Abetting Conversion**

18  **(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

19

20       421.   Plaintiffs reallege and incorporate by reference the allegations

21  contained in paragraphs 1–313 as if fully set forth herein.

22       422.   The funds deposited by Class Members into the Deceptive FTX

23  Platform were personal property of the Plaintiffs and Class Members. Bankman-

24  Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in

25  a specific, identifiable sum of money. The amount that each plaintiff had in their

26  FTX account that they could not withdraw.

27

28

423.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

424.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

425.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

426.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT ELEVEN

### Civil Conspiracy
### (In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)

427.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

428.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

429.    The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce

1    Plaintiff and consumers to invest in the YBAs, FTT and/or use the Deceptive FTX
2    Platform. Defendants each stood to benefit financially from assisting with this
3    fraud as each would receive the financial and other benefits described hereinabove.

4          430.    Defendants engaged in unlawful acts with the FTX Group, namely,
5    the misrepresentations and omissions made to Plaintiffs and the Classes and the
6    sale of unregistered securities as further described hereinabove.

7          431.    Defendants' conspiracy substantially assisted or encouraged the
8    wrongdoing conducted by the FTX Group; further, Defendants had knowledge of
9    such fraud and/or wrongdoing, because of their experience and relationship with
10   the FTX Group, as described above and as such, knew that the representations made
11   to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants
12   knew that the material misrepresentations and omissions relating to the safety of
13   the Deceptive FTX Platform would result in injury to FTX's customers, including
14   Plaintiffs and the Class members.

15         432.    Defendants' conspiracy with the FTX Group to commit fraud caused
16   damages to Plaintiffs and the Classes in the amount of their lost investments.

17

18   ## IN THE ALTERNATIVE, THE OKLAHOMA CLAIMS

19

20   ## COUNT TWELVE

21   **Violations of the Oklahoma Consumer Protection Act**
22   **Okla. Stat. Ann. tit. 15, § 751 *et seq.***
     **(In the alternative, Plaintiff Garrison individually and on behalf of the**
23   **Oklahoma Subclasses)**

24

25         433.    Plaintiffs repeat and re-allege the allegations contained in paragraphs
26   1–313 above, as if fully set forth herein.

27

28

434.    This cause of action is brought pursuant to the Oklahoma Consumer Protection Act ("OCPA")section 751 *et seq*.

435.    The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in section 752." § 753(20).

436.    Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2), and as described more fully herein.

437.    Defendants have violated the OCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

438.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

439.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants', as more fully described herein.

440.    Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTEEN

**Violations of the Oklahoma Uniform Securities Act of 1980**
**Okla. Stat. Tit. 71, §§ 1-101 *et seq*.**
**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

441.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

442.   71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

443.   The Deceptive FTX Platform, YBAs and/or FTT Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

444.   As a result of these actions, Defendants violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully hereinabove.

## COUNT FOURTEEN

### Aiding and Abetting Fraud
### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

445.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 as if fully set forth herein.

446.   The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

447.   Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

448.     Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

449.     Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

450.     Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIFTEEN

### Aiding and Abetting Conversion
### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

451.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–313 as if fully set forth herein.

452.     The funds deposited by Class Members into the Deceptive FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

453.     Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

454.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

455.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

456.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## <u>COUNT SIXTEEN</u>

### Civil Conspiracy
### (In the alternative, Plaintiff Garrison Individually and on behalf of the Oklahoma Subclasses)

457.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–313 above, as if fully set forth herein.

458.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

459.    The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the Deceptive FTX

Platform. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

460.   Defendants engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

461.   Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

462.   Defendants' conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

  a.  Certifying the Class as requested herein;

  b.  Awarding actual, direct and compensatory damages;

  c.  Awarding restitution and disgorgement of revenues if warranted;

  d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

  e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

  f.  Awarding statutory and multiple damages, as appropriate;

  g.  Awarding attorneys' fees and costs; and

  h.  Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as to all claims so triable.

1   Dated: July 21, 2023                              Respectfully submitted,

2                                        **By:** */s/ Mark C. Mao*
                                         **BOIES SCHILLER FLEXNER LLP**
3                                        Mark C. Mao (SBN 236165)
                                         mmao@bsfllp.com
4                                        44 Montgomery Street, 41st Floor
                                         San Francisco, CA 94104
5                                        Telephone:(415) 293-6858
                                         Facsimile: (415) 999-9695
6

7

8                                        **BOIES SCHILLER FLEXNER LLP**
                                         Brooke Alexander (Pro Hac Pending)
9                                        balexander@bsfllp.com
                                         333 Main Street
10                                       Armonk, NY 10504
                                         Telephone: (914) 749-8200
11                                       Facsimile: (914) 749-8300

12

13                                       *Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28